# J. K., P. K. and M. J. K., Plaintiffs-Respondents,

v.

# Mark Peters, Defendant-Appellant.

Court of Appeals

*No. 2010AP2135. Submitted on briefs July 29, 2011.
—Decided September 27, 2011.*

2011 WI App 149

(Also reported in 808 N.W.2d 141.)

507

508

On behalf of the defendants-appellants, the cause was submitted on the briefs of *W. Timothy Steinle* and *Mark C. Severino* of *Terschan, Steinle & Ness*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *John F. Mayer* and *Justin F. Wallace* of *Nash, Spindler, Grimstad & McCracken LLP*, Manitowoc.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Mark Peters appeals from a judgment ordering him to pay over $700,000 in damages to M.J.K. and M.J.K.'s parents J.K. and P.K. (collectively "M.J.K." unless otherwise noted) as a consequence of Peters' sexual assault of M.J.K. Peters argues that the trial court erroneously exercised its discretion when it: (1) permitted into evidence certain expert testimony; and (2) ordered damages. Because we conclude that Peters waived[1] his evidentiary arguments when he failed to raise his claims to the trial court in a

---

[1] In using the term "waiver," we are aware of the recently decided case of *State v. Ndina*, 2009 WI 21, 315 Wis. 2d 653, 761

post-trial motion, and because the trial court did not erroneously exercise its discretion when ordering damages, we affirm.

## BACKGROUND

¶ 2. M.J.K., born in January 1993, is the son of J.K. and P.K. In May 2005, M.J.K. was having behavioral issues at home. J.K. asked Peters, who had been a close family friend for many years and who held a Masters of Social Work degree from the University of Wisconsin-Milwaukee, whether he could help with M.J.K.'s behavior problems. Peters agreed to help. As such, in the summer of 2005, Peters began meeting with M.J.K. for the stated purpose of helping M.J.K. and his parents. Peters continued to work with M.J.K. throughout the summer and fall of 2005, including Sunday sessions that sometimes lasted up to five hours.

¶ 3. As part of his work with M.J.K., Peters offered to take M.J.K. to his home for a weekend in October 2005. J.K. and P.K. trusted Peters and agreed to the overnight session. Accordingly, on October 29, 2005, M.J.K. travelled with Peters to Peters' home and stayed the night for two subsequent evenings. At that time, M.J.K. weighed approximately ninety pounds and was an introverted, self-conscious, non-functioning, pubes-

N.W.2d 612, where our supreme court clarified the distinction between the terms "forfeiture" and "waiver." *See id.*, ¶ 29 ("Although cases sometimes use the words 'forfeiture' and 'waiver' interchangeably, the two words embody very different legal concepts. 'Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.' ") (citation omitted). Although forfeiture may be applicable in this context, we use waiver to be consistent with the cases cited.

511

cent boy with low self-esteem, low confidence and other emotional issues typical of a twelve-year-old boy.

¶ 4. During the first night of the visit, Peters asked M.J.K. to remove his clothes, insisting that he had to check M.J.K.'s muscles for a hernia or an old injury; however, M.J.K. had never discussed a hernia or an old injury with Peters. M.J.K. did not want to remove his clothing and repeatedly told Peters "no." However, following Peters' repeated prodding and insistence, M.J.K. did remove his clothing, exposing his body to Peters, including his genital area. Peters held and manipulated M.J.K.'s penis close to his face while he examined it, and repeatedly moved his hands over M.J.K.'s naked body, under the pretense of performing an exam to help M.J.K. with his body issues.

¶ 5. M.J.K. visited Peters' home again on December 15, 2005, however, there are no allegations that Peters assaulted M.J.K. on that visit.

¶ 6. M.J.K. visited Peters' home for a third time on February 25, 2006, at which time Peters asked M.J.K. to remove all of his clothes and perform pushups and sit-ups while Peters watched him from his bed. Afterwards, Peters made M.J.K. watch a movie with him while sitting together on Peters' bed. For the duration of the movie, Peters held M.J.K. close by wrapping his arm around M.J.K., despite M.J.K.'s protests.

¶ 7. In February 2007, Peters was charged with one count of first-degree sexual assault of a child and two counts of causing a child to expose his genitals. Peters entered an *Alford* plea[2] with respect to the

---

[2] "An *Alford* plea is a guilty plea in which the defendant pleads guilty while either maintaining his innocence or not admitting having committed the crime." *State v. Garcia,* 192

first-degree sexual-assault-of-a-child charge, and the other two counts were dismissed but read in during sentencing. Peters was sentenced to five years of imprisonment and three years of extended supervision, but the sentence was stayed and Peters was placed on probation for eight years. As a condition of his probation, Peters served nine months in jail.

¶ 8. In October 2007, M.J.K. filed this civil action against Peters, alleging loss of society and companionship and multiple intentional torts, including sexual assault of a child, enticement, and causing a child to expose his genitals to an adult.

¶ 9. During discovery, Peters served two interrogatories on M.J.K. that are relevant to Peters' appeal. The first requested that M.J.K. disclose "each and every medical provider, including, but not limited to, M.J.K.'s primary care provider, psychiatrist, psychologist, social worker, psychotherapist, and/or counselor that M.J.K. saw [in] the ten . . . years prior." The second requested that M.J.K. disclose the name and address of the expert witnesses M.J.K. intended to call at trial. In his responses to the interrogatories, M.J.K. did not disclose Charles Schmidt, a social worker, as a treatment provider or otherwise disclose that he may call Schmidt as an expert witness at trial.

¶ 10. The trial court's scheduling and amended scheduling orders also required M.J.K. to provide Peters with "the names, addresses, and resumes together with a written report for each expert [witness]" he intended to call at trial. M.J.K. provided Peters with a written list of his expert witnesses, and later provided Peters with an amended list. M.J.K. disclosed numerous expert witnesses, including Dr. Charles Lodl, who ulti-

Wis. 2d 845, 856, 532 N.W.2d 111 (1995); *see also North Carolina v. Alford*, 400 U.S. 25 (1970).

mately did testify at trial. However, neither report disclosed Schmidt as a potential expert witness or provided an expert report for Schmidt.

¶ 11. Dr. Lodl was deposed in December 2009. Among other things, Dr. Lodl testified that, based upon M.J.K.'s medical records and his conversations with M.J.K., he understood Schmidt to be treating M.J.K. once or twice a month, "focusing primarily on school achievement issues and at-home behavior." Dr. Lodl stated that based upon his review of the medical records, he did not see any indication that Schmidt was treating M.J.K. for sexual abuse issues. Peters contends that this was the first time he was made aware that M.J.K. was being treated by Schmidt in any fashion.

¶ 12. On January 4, 2010, M.J.K. submitted his pretrial report, which included a witness list. M.J.K. listed Schmidt as an expert witness. On February 12, 2010, Peters received M.J.K.'s medical records from Aurora Behavioral Health, including Schmidt's treatment records. Over Peters' objection, the parties deposed Schmidt on February 13, 2010, two days before trial.

¶ 13. On the first day of trial, Peters brought a motion in limine, attempting to bar Schmidt from testifying or to adjourn trial and impose sanctions based upon M.J.K.'s failure to timely disclose Schmidt as a potential expert witness. The trial court denied the motion, concluding that Schmidt had been identified in M.J.K.'s pretrial report and that Peters had been aware of Schmidt's treatment of M.J.K. since Dr. Lodl's deposition in December. Furthermore, the trial court noted that Peters had authorizations for M.J.K.'s medical records and could have obtained Schmidt's treatment notes from Aurora immediately after Dr. Lodl's deposition, but chose not to do so. The trial court did, however, limit the scope of Schmidt's testimony to those opinions also rendered in his treatment notes.

¶ 14. A trial to the court was held on February 15 through 19, February 22, and April 27, 2010. During the trial, numerous witnesses testified on behalf of M.J.K., including Dr. Lodl. Schmidt did not testify, but his deposition testimony was entered into evidence as limited by the trial court's prior order. Only Peters testified for the defense.

¶ 15. As relevant to Peters' appeal, on February 18, 2010, Dr. Lodl testified at trial. However, the parties ran out of time, and due to scheduling conflicts, Dr. Lodl's testimony did not resume until April 27, 2010. In April, Dr. Lodl testified that, since the court had adjourned on February 18, he had reviewed Schmidt's deposition testimony in its entirety regarding M.J.K.'s treatment. Based upon his review of Schmidt's deposition testimony, Dr. Lodl testified that he understood Schmidt to be treating M.J.K. for ongoing sexual abuse issues, although in doing so, Schmidt could not ignore the difficulties M.J.K. was having in school.

¶ 16. Peters immediately moved for a mistrial, arguing that Dr. Lodl's opinions regarding Schmidt's treatment had changed since Dr. Lodl's December deposition. Peters contended that Dr. Lodl's allegedly new opinions were based upon his reading of Schmidt's deposition testimony while the court was adjourned, without notifying Peters. The trial court denied the motion, but allowed Peters' counsel to question Dr. Lodl about his allegedly new opinions, and the trial court stated that based upon Dr. Lodl's answers it may reconsider its ruling. During Peters' counsel's renewed questioning, Dr. Lodl testified that the deposition transcript did not change his prior opinions regarding the treatment M.J.K. received, but merely verified his previously held opinions.

515

¶ 17. Peters again moved for a mistrial, and the trial court again denied his motion. While the trial court expressed some concern that Dr. Lodl had read Schmidt's entire deposition transcript, even though some parts had previously been struck by the court, Dr. Lodl testified that he did not rely on those parts of the transcript in reaching his opinions and that the transcript did not change his opinions, but merely verified them.

¶ 18. At the conclusion of the trial, the trial court issued extensive written findings of fact and conclusions of law.

¶ 19. With respect to M.J.K., the trial court found that M.J.K. now suffers from a litany of psychological and emotional disorders, struggles in school (despite performing well prior to Peters' abuse), is withdrawn in school, and is unlikely to graduate high school with his class. The trial court concluded that Peters' sexual assaults, enticements, grooming, and deceit were substantial factors in causing all of these injuries, that M.J.K. has not recovered from the injuries Peters caused, and that M.J.K.'s injuries are permanent. M.J.K. will require medical and psychological treatment in the future, even though he currently does not want to attend such treatment because it is too painful.

¶ 20. The trial court also found that Peters had not expressed any guilt or remorse for his actions, nor had he accepted any responsibility for the consequences of his conduct. Furthermore, the trial court concluded that Peters' credibility was substantially impaired by his repeated and deliberate misrepresentations, lack of candor and honesty, and continued efforts to diminish the impact of his conduct. In fact, the trial court found Peters to be so disingenuous that it went so far as to expressly disregard any of Peters' testimony that was

516

not supported by other credible evidence. The trial court also noted that Peters purposefully lied about the existence, location, and value of his material wealth and possessions, which the trial court calculated to total over $3.4 million.

¶ 21. Ultimately, the trial court awarded to M.J.K.: $73,000 in future medical expenses, $100,000 for past pain and suffering, $150,000 for future pain and suffering, $100,000 for future loss of earning capacity, and $200,000 in punitive damages. To P.K. and J.K., the trial court awarded: $7783 for past medical expenses, $25,000 each for the loss of society and companionship of their son, and $10,000 each in punitive damages.

¶ 22. Peters did not file any post-trial motions or otherwise ask the court to reconsider any of its evidentiary rulings. He now appeals.

## DISCUSSION

¶ 23. Peters' claims on appeal are twofold. First, he argues that the trial court erred with respect to certain evidentiary rulings, including admitting Schmidt's deposition testimony and failing to grant a mistrial when Dr. Lodl rendered opinions based on work completed during the trial's adjournment. Second, Peters challenges the trial court's damages award with respect to future loss of earning capacity, future care and treatment, past care and treatment, and punitive damages. We address each in turn.

## I. Peters waived his evidentiary claims when he failed to raise them in a post-trial motion.

■

¶ 24. Peters raises two evidentiary claims on appeal. First, he contends that the trial court erroneously exercised its discretion when it failed to bar Schmidt's

deposition testimony from being admitted at trial, or in the alternative, failed to grant a continuance to permit Peters an opportunity to prepare for Schmidt's testimony. Second, he argues that the trial court again erroneously exercised its discretion when it failed to grant a mistrial after Dr. Lodl rendered opinions based upon work he performed during the trial's adjournment. In response, M.J.K. submits that Peters waived these evidentiary claims when he failed to raise them in a post-trial motion. We agree with M.J.K. that Peters has waived his evidentiary claims.

¶ 25. We held in *Ford Motor Company v. Lyons*, 137 Wis. 2d 397, 405 N.W.2d 354 (Ct. App. 1987), that "failure to include alleged errors in the motions after verdict constitutes a waiver of the errors." *Id.* at 417. As such, we noted that " '[m]otions after verdict must state with particularity the alleged error so as to apprise the trial court of the alleged error and give it an opportunity to correct it, thereby avoiding a costly and time consuming appeal.' " *Id.* (citation omitted). The rule applies even "where a proper objection is made during the course of trial." *Id.* We recently reiterated that holding in *Suchomel v. University of Wisconsin Hospital & Clinics*, 2005 WI App 234, ¶ 10, 288 Wis. 2d 188, 708 N.W.2d 13.

¶ 26. Peters admits that he failed to raise his evidentiary claims in a post-trial motion, but argues that *Ford Motor* and *Suchomel* are inapplicable because both *Ford Motor* and *Suchomel* involved trials to a jury, and, here, the trial was before the court. *See Ford Motor*, 137 Wis. 2d at 415 (referencing the jury's verdict); *Suchomel*, 288 Wis. 2d 188, ¶ 1 (same). Peters goes on to cite Wis. STAT. § 805.17(4) (2009–10)[3] in support of his assertion

---

[3] WISCONSIN STAT. § 805.17(4) (2009–10) states:

that the rules applying to jury trials and court trials are fundamentally different, thereby exempting him from the explicit requirements of *Ford Motor*. We do not find Peters' arguments to be persuasive.

¶ 27. First, the reasoning behind *Ford Motor*'s requirement that evidentiary claims be raised in post-trial motions applies equally to cases tried before juries and cases tried to the court: the trial court should be notified of any alleged error to be given an opportunity to correct it and avoid costly and time consuming appeals. *See id.*, 137 Wis. 2d at 417. Furthermore, notifying the trial court of an alleged error not only provides the trial court a chance to assess the validity of any alleged error, but also provides the trial court an opportunity to elaborate upon its prior decision and explain whether it relied on the challenged evidence, and if so, to what extent. The benefits of such a requirement apply equally to jury and court trials.

¶ 28. Second, Wis. Stat. § 805.17(4) states that, in cases tried before the trial court, questions of *sufficiency of the evidence* need not be raised to the trial court before being raised on appeal. The statute is silent on whether claims regarding *evidentiary rulings* need to be raised in post-trial motions. As such, the statute is inapplicable to the issue before us. We note that Peters has not cited to a corollary statute for evidentiary issues.

■■

¶ 29. Our analysis, however, does not end there. *Ford Motor* does permit us to review a waived claim

Appeal. In actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may be raised on appeal whether or not the party raising the question has objected in the trial court to such findings or moved for new trial.

All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

when doing so is in the interest of justice. *See id.*, 137 Wis. 2d at 417. "However, such action is not to be taken by us unless we are convinced, on the record as a whole, that there has been a probable miscarriage of justice." *Id.* at 418. "A probable miscarriage of justice exists only if the evidence and law are such that the defendant[] probably should have won and therefore deserve[s] another chance." *Id.* at 422.

¶ 30. Peters urges us to conclude that such a miscarriage of justice has occurred here. However, he cites to no evidence demonstrating that he "probably should have won." *See id.* Instead, Peters simply argues that "[i]t would be a serious miscarriage of justice to hold that [he] waived his right to appeal the trial court's ruling on [his] motion in limine simply because he did not bring a post-verdict motion." (Emphasis omitted.) That conclusory argument does not convince us that a miscarriage of justice occurred in this case or that Peters "probably should have won." *See id.* Nor does our review of the evidence reveal that such a miscarriage has occurred.

## II. The trial court properly exercised its discretion with respect to Peters' damages claims.

¶ 31. Next, Peters alleges that the trial court erred in awarding damages for: (1) M.J.K.'s future loss of earning capacity; (2) M.J.K.'s future care and treatment; (3) M.J.K.'s past care and treatment; and (4) punitive damages to M.J.K., P.K., and J.K. We disagree and will address each damage award in turn.

¶ 32. Determining damages is within the trial court's discretion. *Three & One Co. v. Geilfuss*, 178

Wis. 2d 400, 410, 504 N.W.2d 393 (Ct. App. 1993). We will not reverse the trial court's findings of fact on damages unless they are clearly erroneous. *See* Wis. Stat. § 805.17(2) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). "Whether the trial court applied a proper legal standard in determining damages is a question of law which we review *de novo.*" *Three & One Co.,* 178 Wis. 2d at 410.

### 1. Future Loss of Earning Capacity

¶ 33. Peters first contends that the trial court erred in awarding M.J.K. $100,000 for future loss of earning capacity because there was no evidence admitted to support such an award. In response, M.J.K. states that the testimony of his teachers, high school counselor, and Dr. Lodl are sufficient to support the trial court's award. We agree with M.J.K.

¶ 34. To prove a loss-of-future-earnings claim, the factfinder must be satisfied that the plaintiff suffered a loss of future earning capacity as a result of injuries inflicted by the defendant. *See* Wis JI-Civil 1762. If the factfinder is so satisfied, it determines future loss of earnings by calculating the difference between what the plaintiff will reasonably be able to earn in the future in view of the injuries sustained and what he would have been able to earn had he not been injured. *See id.*

¶ 35. Medical evidence of disability, in combination with other evidence regarding a claimant's employment history, education, aptitude, and ability, *may* support an award for loss of future earning capacity, but

521

is not required. *See Hoeft v. Milwaukee & Suburban Transp. Corp.*, 42 Wis. 2d 699, 715, 168 N.W.2d 134 (1969). "[T]he quantum of proof required to sustain a finding of loss of future earning capacity is not as great as that required in other damage issues." *Krause v. Milwaukee Mut. Ins. Co.*, 44 Wis. 2d 590, 616, 172 N.W.2d 181 (1969).

¶ 36. The trial court concluded "that M.J.K. has suffered a loss of earning capacity of $100,000.00 as a direct result of M.J.K.'s failure to graduate high school due to the sexual assaults, enticements, grooming, deceit, and other conduct perpetrated by . . . Peters." In support of its award, the trial court cited to testimony from:

- M.J.K.'s teachers, including his seventh grade language and reading teacher, who taught M.J.K. at the time the abuse started, and who testified that M.J.K. was a "B" student at the beginning of the school year but that his grades fell as the school year progressed and he became more withdrawn;

- M.J.K.'s high school counselor, who testified that M.J.K. had a "D" average in high school, despite testing as proficient and advanced on standardized assessment tests;

- Dr. Lodl, who testified that there is a direct relationship between the sexual abuse and M.J.K.'s decline in school performance; and

- M.J.K., who testified that he thinks about the sexual abuse "[a]ll the time," for example, "if I'm in school working on work, it'll just pop in my head and I'll get distracted and keep thinking about that."

¶ 37. Based upon the trial court's finding that M.J.K. has an additional expected life expectancy of fifty-eight years, which Peters does not contest, and the testimony of the above-listed witnesses, the trial court ultimately concluded that M.J.K. could expect a future loss of earning capacity of approximately $100,000, which works out to $1724.14 per year for the rest of his life ($100,000/fifty-eight years). The evidence of M.J.K.'s decline in school performance and likely failure to graduate high school with his class, which was linked to the sexual abuse inflicted upon him by Peters, supports a reasonable inference that M.J.K.'s future earning capacity is diminished by a mere $1724.14 per year. While the evidence is not overwhelming, a plaintiff must be permitted to introduce evidence of a somewhat speculative nature when discussing future earning capacity, particularly when that plaintiff is a teenage boy. *See McCrossen v. Nekoosa Edwards Paper Co., Inc.*, 59 Wis. 2d 245, 262, 208 N.W.2d 148 (1973) ("Wisconsin cases have recognized that, in order to show the impairment of future earning capacity, a plaintiff must be permitted to introduce evidence that is more speculative and uncertain than would be acceptable for proof of historical facts."). The trial court's finding is not clearly erroneous as the evidence here is enough to support the trial court's meager award for loss of future earning capacity.

2. *Future Care and Treatment*

¶ 38. Next, Peters argues that the trial court erred in awarding M.J.K. $73,000 in future care and treatment, arguing that there is no credible evidence in the record to support that award. Peters submits that Dr. Lodl, the only expert witness who testified to the cost of M.J.K.'s future injuries, only testified to $44,000 in future costs. We disagree.

¶ 39. In order to sustain an award for future care and treatment, "two criteria must be met: (1) there must be expert testimony of permanent injuries, requiring future medical treatment and the incurring of future medical expenses; and (2) an expert must establish the cost of such medical expenses." *Weber v. White*, 2004 WI 63, ¶ 20, 272 Wis. 2d 121, 681 N.W.2d 137. However, the "law does not require mathematical certainty to determine future health care expenses. As long as the decision is based on probability and not possibility, the court can make such an award." *Id.*, ¶ 30. Peters concedes for the purposes of appeal that M.J.K.'s injuries are permanent.

¶ 40. Dr. Lodl testified to a reasonable degree of medical probability that M.J.K. would need a minimum of $5000 in treatment in the next year and that he would need future treatment beyond that first year during certain developmentally demanding times in his life. Dr. Lodl described those times in his report:

> Because [M.J.K.] is still an adolescent, it is likely that he will require periodic psychological attention as he grows older, gains perspective, and faces additional developmental demands, such as increasing demand to develop and maintain heterosocial relationships, dating, leaving home, marriage, child rearing, and so forth. At these times, individuals who have been sexually victimized have found it helpful to reconnect with a therapist for at least a brief course of therapy.

We note that while Dr. Lodl testified that M.J.K. would likely require treatment in the future when faced with five different "development demands"—including developing and maintaining heterosocial relationships, dating, leaving home, marriage, and child rearing—Dr.

Lodl did not limit the number of times these developmental demands would take place. Furthermore, Dr. Lodl's list was non-exhaustive and only set forth *examples* of the types of developmental demands that would require additional treatment, beginning the list with "such as" and concluding the list with "so forth." We further note that some of the demands, by their very nature, repeat, for example, heterosocial relationships, dating, and child rearing.

¶ 41. Dr. Lodl noted in his expert report that "[e]stimating the cost of [M.J.K.]'s therapy is very difficult." However, "[t]he law does not require mathematical certainty to determine future health care expenses." *Id.* Dr. Lodl's report noted that the cost of M.J.K.'s future care and treatment will depend on several variables, such as: M.J.K.'s and his family's professional and economic resources, the cost of services, the extent M.J.K. requires services, the success of M.J.K.'s first years of treatment, and the life changes M.J.K. goes through. Dr. Lodl testified that each time M.J.K. faces a developmental demand, like the examples given, M.J.K. will need up to one year (or fifty-two weeks) of weekly treatment at $150 a session.

¶ 42. Peters argues that Dr. Lodl only described five developmental demands and that, therefore, when calculating future damages, the trial court was limited to presuming that Peters will experience each developmental demand only once. By Peters' calculations, the trial court may only award M.J.K. up to $39,000 (fifty-two weeks of treatment x $150 per session x five treatable developmental demands). But Peters incorrectly describes Dr. Lodl's testimony. Dr. Lodl's list of developmental demands was non-exhaustive and illustrative of changes that repeat within one's lifetime. The

trial court, as factfinder, was not obligated to find that M.J.K. would only need treatment five times in the future. His life expectancy was established to be another fifty-eight years. Thus, there is ample support in the record for the trial court's finding that M.J.K.'s future treatment needs were $73,000.

### 3. Past Care and Treatment

¶ 43. Peters contends that the trial court erred in awarding $7783 in past care and treatment because Dr. Lodl was not qualified to render an opinion on whether all of M.J.K.'s past treatment was causally related to the sexual assault and that therefore there was no expert testimony to vouch for the reasonableness and necessity of bills. We disagree.

■■■

¶ 44. An injured plaintiff may only recover the value of medical expenses he or she actually incurred. *Correa v. Farmers Ins. Exch.*, 2010 WI App 171, ¶ 3, 330 Wis. 2d 682, 794 N.W.2d 259. Prior to July 1, 2009, the value of incurred medical expenses could only be proven by expert testimony. *Id.* However, after the passage of WIS. STAT. § 908.03(6m)(bm),[4] "a party desiring to prove the reasonableness of a medical expense need no longer have a qualified expert so testify," as long as bills reflecting past medical expenses are: (1) received into evidence; and (2) patient health care records. *Correa*, 330 Wis. 2d 682, ¶ 4.

---

[4] WISCONSIN STAT. § 908.03(6m)(bm) states, in pertinent part: "*Presumption.* Billing statements or invoices that are patient health care records are presumed to state the reasonable value of the health care services provided and the health care services provided are presumed to be reasonable and necessary to the care of the patient."

¶ 45. Here, there is no question that M.J.K. incurred $7783 in medical bills for his treatment. And there is no question that the reasonableness of those charges is presumed under *Correa*.[5] The only question is whether Dr. Lodl is qualified to testify that Peters caused M.J.K.'s need for that treatment. We conclude that he is. Dr. Lodl is a licensed psychologist who testified, after reviewing all of M.J.K.'s medical records and evaluating M.J.K., that M.J.K. suffered psychological damage from Peters' actions necessitating treatment by several treatment professionals, including Schmidt. Dr. Lodl's testimony is sufficient evidence for the trial court to conclude that Peters caused M.J.K.'s need for all of the $7783 worth of treatment.

¶ 46. Given Dr. Lodl's expertise and testimony on causation and the presumption of reasonableness of the bills, the trial court's finding is not clearly erroneous.

### 4. Punitive Damages

¶ 47. Finally, Peters argues that neither M.J.K. nor P.K. and J.K. are entitled to punitive damages because this is a "mere touching" case. In the alternative, Peters argues that the trial court's punitive damages award is excessive and in violation of Peters' due process rights. We disagree.

---

[5] Peters does not even acknowledge M.J.K.'s argument that WIS. STAT. § 908.03(6m)(bm) negates the necessity for expert testimony when establishing the reasonableness of past medical expenses. Consequently, we deem M.J.K.'s argument admitted. *See State v. Chu*, 2002 WI App 98, ¶ 41, 253 Wis. 2d 666, 643 N.W.2d 878 ("Unrefuted arguments are deemed admitted.").

¶ 48. A "plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." WIS. STAT. § 895.043(3).

> [A] person acts in an intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded. This will require that an act or course of conduct be deliberate. Additionally, the act or conduct must actually disregard the rights of the plaintiff, whether it be a right to safety, health or life, a property right, or some other right. Finally, the act or conduct must be sufficiently aggravated to warrant punishment by punitive damages.

*Strenke v. Hogner*, 2005 WI 25, ¶ 38, 279 Wis. 2d 52, 694 N.W.2d 296. A plaintiff must prove by clear and convincing evidence that the defendant was aware that his conduct was substantially certain to result in the plaintiff's rights being disregarded. *See Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶¶ 8, 34, 279 Wis. 2d 4, 694 N.W.2d 320. Whether there is sufficient evidence to support an award of punitive damages is a question of law we review *de novo. See id.*, ¶¶ 31–32.

¶ 49. Here, the trial court found that, throughout the summer and fall of 2005, that Peters "groomed" M.J.K. for the purpose of engaging in a sexual relationship with him; that Peters expressly asked P.K. and J.K. if M.J.K. could come to his home in October 2005; and that Peters wanted M.J.K., P.K., and J.K. to trust him. Once M.J.K. arrived in Peters' home, Peters insisted that M.J.K., a twelve-year-old boy with low self-esteem

and confidence issues, undress and acquiesce to Peters holding and manipulating his penis. Peters later had M.J.K. perform exercises in the nude. The trial court found that the sexual assault "was the culmination and consequence of . . . Peters' deliberate and purposeful efforts to obtain the trust and loyalty of [M.J.K., P.K., and J.K.]."

¶ 50. Peters does not contest the trial court's careful and thoughtful findings of fact. Instead, Peters submits that he did not act maliciously or disregard M.J.K.'s rights because he only "touch[ed] M.J.K. and ask[ed] him to do exercises in front of him in the nude. This is not a case where there was any penetration of any kind, there was no rape, M.J.K. did not touch [Peters], and [Peters] did not masturbate himself." These statements grossly underestimate the effect of Peters' actions on M.J.K., a developing and vulnerable twelve-year-old boy, who was in the care of an adult authority figure whom he trusted. It is simply disingenuous for Peters to argue that fondling a twelve-year-old boy and pressuring him to perform nude exercises was not malicious or did not disregard the boy's rights. *See Strenke*, 279 Wis. 2d 52, ¶ 38.

¶ 51. With respect to M.J.K.'s parents, Peters argues that they are not entitled to punitive damages because they "sought [Peters'] help with their son's bad behavior. [Peters] did not seek out M.J.K." That P.K. and J.K. sought the assistance of a trusted friend/social worker for help, does not lead to the conclusion that Peters did not then intentionally and maliciously disregard P.K.'s and J.K.'s rights to a healthy relationship with their son. To the contrary, the trial court found that Peters deliberately acted over the summer and fall of 2005 to gain the trust of P.K. and J.K. to enable him to take their son to his home for the purpose of sexually

assaulting him. Given the trial court's findings, it is clear that Peters intentionally and maliciously disregarded P.K.'s and J.K.'s rights to a healthy relationship with their son when Peters sexually assaulted M.J.K.

¶ 52. Furthermore, the trial court's punitive damages award—$200,000 to M.J.K. and $10,000 each to P.K. and J.K.—is not so excessive as to violate Peters' due process rights.

¶ 53. "An award is excessive, and therefore violates due process, if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing." *Trinity Evangelical Lutheran Church and School-Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 50, 261 Wis. 2d 333, 661 N.W.2d 789. "[T]he purpose of punitive damages is to punish the wrongdoer, and to deter the wrongdoer and others from similar conduct, rather than to compensate the plaintiff for any loss." *Id.* "[O]nly when an award can be fairly categorized as 'grossly excessive,' in relation to the [S]tate's interests in punishment and deterrence, does it enter the zone of arbitrariness that violates due process." *Id.*, ¶ 51 (citation omitted). "Punitive damages are particularly appropriate where the defendant sexually assaults his victim." *Kink v. Combs*, 28 Wis. 2d 65, 79, 135 N.W.2d 789 (1965). Whether a punitive damages award is excessive is a question we review *de novo. D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson*, 2008 WI 126, ¶ 79, 314 Wis. 2d 560, 757 N.W.2d 803.

¶ 54. To determine whether an award of punitive damages is excessive, we look to: (1) the grievousness of the defendant's acts; (2) the defendant's degree of malicious intent; (3) whether the award bears a reason-

able relationship to the award of compensatory damages; (4) the potential damage that might have been caused by the acts; (5) the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and (6) the wealth of the wrongdoer. *Trinity*, 261 Wis. 2d 333, ¶ 53.

¶ 55. To begin, Peters' behavior was undeniably grievous, undertaken with malicious intent, and not only had the potential to inflict much harm upon his victims, but actually did inflict such harm. As we have previously set forth, Peters intentionally sexually assaulted M.J.K. when he was twelve years old, after months of working to gain the trust of both M.J.K. and his parents for the purpose of perpetrating the abuse. The trial court found that the sexual assault resulted in excessive psychological trauma to M.J.K. and harmed his relationships with P.K. and J.K.

¶ 56. We also conclude that the trial court's $220,000 punitive damages award bears a reasonable relationship to the trial court's $480,783 compensatory damages award,[6] as it is less than half of that award. Nor is the award excessive in light of the trial court's finding that Peters has a net worth of more than $3.4 million, a finding which is amply supported by evidence in the record. We also conclude that the $220,000 cannot be considered excessive in light of the criminal penalties Peters faced, to wit, up to sixty years imprisonment for first-degree sexual assault of a child, the

[6] The $480,783 compensatory damages award was calculated by adding the following damage awards: $7,783 for past medical expense; $73,000 for future medical expenses; $100,000 for past pain and suffering; $50,000 for loss of society and companionship; $150,000 for future pain and suffering; and $100,000 for future loss of earning capacity.

charge to which he pled. *See* Wis. Stat. § 948.02(1)(e) (establishing first-degree sexual assault of a twelve-year-old child as a Class B felony); *see also* Wis. Stat. § 939.50(3)(b) (setting forth the maximum penalties for Class B felonies).

¶ 57. In sum, the trial court's $220,000 punitive damages award is not clearly erroneous nor is it excessive in light of the grievousness and maliciousness of Peters' actions, the harm he inflicted upon his victims, the other damages awarded and criminal penalties Peters faced, and his wealth.

*By the Court.*—Judgment affirmed.