# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP1514 |
| COMPLETE TITLE: | Robert L. Kimble and Judith W. Kimble, |

Robert L. Kimble and Judith W. Kimble,
           Plaintiffs,
      v.
Land Concepts, Inc., John E. Stevenson and Jane E.
Stevenson, Trustees of the John E. and Jane E. Stevenson
Revocable Trust, Dorene E. Dempster and Mark F. Herrell,
           Defendants,
John E. Stevenson and Jane E. Stevenson,
           Defendants-Respondents,
First American Title Insurance Company,
           Defendant-Appellant-Petitioner.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 345 Wis. 2d 60, 823 N.W.2d 839
(Ct. App. 2012 – Unpublished)

| | |
|---|---|
| OPINION FILED: | April 22, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 19, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Door |
| JUDGE: | D. Todd Ehlers |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
| NOT PARTICIPATING: | PROSSER, J., did not participate. |

ATTORNEYS:

     For the defendant-appellant-petitioner, there were briefs by *J. Bushnell Nielsen*, *Rebecca Leair*, and *Reinhart Boerner Van Deuren S.C.*, Waukesha, and oral argument by *J. Bushnell Nielsen*.


     For the defendants-respondents, there was a brief by *David H. Weber*, *T. Wickham Schmidt*, and *Conway, Olejniczak & Jerry, S.C.*, Green Bay, and oral argument by *David H. Weber*.

An amicus curiae brief was filed by *James A. Friedman*, *Kerry L. Gabrielson*, and *Godfrey & Kahn, S.C.*, Madison, on behalf of the Wisconsin Insurance Alliance, the Wisconsin Civil Justice Council, Inc., and Wisconsin Manufacturers & Commerce.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2011AP1514
(L.C. No.  2009CV188)

STATE OF WISCONSIN          :          IN SUPREME COURT

Robert L. Kimble and Judith W. Kimble,

          Plaintiffs,

     v.

Land Concepts, Inc., John E. Stevenson and Jane E. Stevenson, Trustees of the John E. and Jane E. Stevenson Revocable Trust, Dorene E. Dempster and Mark F. Herrell,

          Defendants,

John E. Stevenson and Jane E. Stevenson,

          Defendants-Respondents,

First American Title Insurance Company,

          Defendant-Appellant-Petitioner.

**FILED**

**APR 22, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Reversed and cause remanded.*

¶1   ANNETTE KINGSLAND ZIEGLER, J.   This is a review of an unpublished decision of the court of appeals, Kimble v. Land Concepts, Inc., No. 2011AP1514, unpublished slip op. (Wis. Ct.

App. Oct. 11, 2012), affirming the judgment of the Door County Circuit Court,[1] upholding a jury award of punitive damages against First American Title Insurance Company ("First American").

¶2 First American argues that the punitive damages award against it was excessive and violated its right to due process under the United States and Wisconsin constitutions.[2]

¶3 John E. and Jane E. Stevenson ("Stevensons")[3] argue that First American had no right to appeal the punitive damages award because it filed its post-verdict motion late. The Stevensons also argue that the award was reasonable in light of First American's bad faith conduct, and the harm that they might have suffered as a result of that bad faith. The Stevensons further contend that punitive damages were appropriate because First American's conduct needed to be deterred.

¶4 We conclude that the punitive damages award in this case was excessive and deprived First American of its right to due process. We therefore reverse the court of appeals'

---

[1] The Honorable D. Todd Ehlers presided.

[2] First American's petition for review addressed four issues. We granted review, however, solely on the issue of whether the punitive damages award was unconstitutionally excessive.

[3] The original plaintiffs in this action, Robert L. Kimble and Judith W. Kimble, assigned their rights under their title insurance policy, including any claims against First American, to the Stevensons as part of a settlement agreement.

decision and remand this case to the circuit court for entry of a judgment against First American in the amount of $239,738.49.

## I.   BACKGROUND FACTS

¶5   On October 26, 2004, Robert L. Kimble and Judith W. Kimble ("Kimbles") purchased a lakefront lot located in the Town of Nasewaupee in Door County ("Kimble Lot") from Dorene Dempster ("Dempster") and Mark Herrell ("Herrell").[4]   A private cut-off road that crossed the property immediately to the west provided access to the Kimble Lot.   That property was owned by Land Concepts, Inc. ("Land Concepts").

¶6   The deed executed by Dempster and Herrell conveying the Kimble Lot to the Kimbles warranted that the property was benefitted by two easements.   One easement purported to grant the Kimble Lot use of a private driveway connecting it to County Highway M across property to the north ("North Easement").   That private driveway had not been used in many years at the time of the sale.   The other easement purported to grant the Kimble Lot access to County Highway M across Land Concepts' property ("West Easement").[5]   It is undisputed that the cut-off road was not within the boundaries of either of these easements.

¶7   On October 27, 2004, First American issued the Kimbles a title insurance policy for the Kimble Lot.   The policy

---

[4] Dempster and Herrell had originally purchased the lot from the Stevensons.   All were initially defendants in the Kimbles' lawsuit.

[5] The West Easement traversed property belonging only to Land Concepts, while the North Easement traversed property belonging to both Land Concepts and other owners.

3

obligated First American to defend and indemnify the Kimbles for any covered loss, including losses resulting from "[u]nmarketability of the title" and "[l]ack of a right of access to and from the land." The policy did not insure any specific route of access.

¶8 In early 2008, the Kimbles listed their property for sale with a real estate agent.[6] On March 5, 2008, the Kimbles' agent received a letter from Land Concepts stating that the Kimbles "do not own——and cannot convey——any access rights to County Highway M" from the Kimble Lot. The letter instructed the agent to make prospective purchasers of the Kimble Lot aware of lack of access rights "[i]n order to avoid possible future misunderstandings and/or confusion." On March 17, 2008, the Kimbles' attorney contacted the Kimbles' local insurance agent, Marilyn DeNamur ("DeNamur"), about the dispute. DeNamur forwarded the matter to Donald Schenker ("Schenker"), an assistant vice president at First American.

¶9 On March 18, 2008, DeNamur provided Schenker with the deeds and other recorded documents purportedly granting the North and West Easements to the Kimbles' predecessors in title. In a follow-up message to Schenker on March 28, DeNamur noted that there appeared to be a problem with the deeds purporting to grant and convey the North Easement. DeNamur asked Schenker

---

[6] The precise date of the real estate listing is not a part of the record.

4

whether she should "continue to dig for more documentation?" Schenker never asked for more research.[7]

¶10 On March 31, 2008, Schenker, on behalf of First American, sent the Kimbles a letter which addressed the access issue. Schenker indicated in his letter that he believed the West Easement was defective.[8] Schenker asserted, however, that the North Easement continued to provide the Kimble Lot access to the highway, and because the title remained as insured, First American had no duty to intervene in the dispute. In his letter, Schenker described the chain of title he claimed supported the North Easement, but made no mention of the problems identified by DeNamur.

¶11 On May 27, 2008, the Kimbles forwarded Schenker a copy of a letter they intended to send to Land Concepts asserting their right to use the cut-off road. The Kimbles asked Schenker whether the letter jeopardized their title insurance policy. On May 28, 2008, Schenker assured the Kimbles that it did not, again implicitly asserting that another right of access existed.

¶12 On June 13, 2008, the Kimbles received a response letter from Land Concepts, wherein Land Concepts threatened to "close the access over [its] property" if the dispute was not

---

[7] The record is devoid of any direct response from Schenker to DeNamur's March 28, 2008 e-mail message.

[8] Specifically, Schenker wrote that the document recording the easement failed to identify the property benefitted, and thus failed to comply with Wis. Stat. § 706.02(1) (2009-10). All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

"promptly resolved." On June 18, 2008, the Kimbles contacted Schenker regarding the threatened closure. The Kimbles asked Schenker whether First American would insure the North Easement under the title policy if the Kimbles constructed a new driveway following the route of that easement.

¶13 On June 25, 2008, Schenker reiterated to the Kimbles that their title policy did not insure any particular route of access. Schenker again asserted that the North Easement provided access and stated, "[w]hether there is some legal defense to prevent the Kimbles from using it, which falls under some exclusion or exception in the policy, we do not know." Schenker further recommended that the Kimbles have a survey of the North Easement performed before constructing any driveway.

¶14 The Kimbles continued to market their property throughout 2008, relying on Schenker's assurances that it had good access to the highway. Land Concepts continued to dispute the Kimbles' right of access, but did not follow through on its threat to physically close the cut-off road.

¶15 On January 12, 2009, the Kimbles received a cash offer to purchase their property. The sale was made contingent on the access issue being resolved. Despite an extension on the original 30-day time limit, the Kimbles were unable to negotiate a resolution with Land Concepts and lost the sale.

## II. PROCEDURAL POSTURE

¶16 On June 3, 2009, the Kimbles filed suit against Land Concepts and the Stevensons. The Kimbles sought a declaration that the North Easement was valid and sought a prescriptive

6

easement for their use of the cut-off road.  The Kimbles also claimed that Land Concepts, in recording the West Easement, had slandered the title to the Kimbles' property.

¶17 On October 23, 2009, the Kimbles amended their complaint adding breach of warranty claims against Dempster, Herrell, and the Stevensons, and a breach of contract claim against First American for failing to defend the title to their property.

¶18 On July 21, 2010, the Kimbles settled their claims against all the defendants except First American.  As part of the settlement, the Kimbles and the Stevensons paid Land Concepts $40,000 to secure an easement over the route of the existing cut-off road.  The Stevensons paid an additional $10,000 to the Kimbles for an assignment of the Kimbles' rights under the title insurance policy, including any claims against First American.

¶19 On August 6, 2010, the Stevensons filed a cross-claim against First American, alleging breach of contract and breach of fiduciary duty and bad faith in First American's refusal to defend the title to the Kimble Lot.

¶20 On December 1, 2010, First American filed a motion for declaratory and summary judgment, asking the court to dismiss the Stevensons' cross-claim.  First American argued that the Stevensons were not "insureds," and thus had no rights under the title policy.  First American also contended that the Kimbles were not permitted to settle their claims against other

defendants without the written consent of First American.  First American asserted that the title policy was void as a result.

¶21  The Stevensons argued that the Kimbles were permitted to assign their rights under the title policy, and that the partial settlement was proper under the terms of the insurance contract.  The Stevensons also asserted that, to the extent summary judgment was warranted, it should be granted against First American on the Stevensons' breach of contract claim.

¶22  On January 18, 2011, the circuit court denied First American's motion for declaratory and summary judgment.  The court concluded that the assignment of rights from the Kimbles to the Stevensons was proper and that there were issues of fact to be tried regarding the Stevensons' breach of contract and breach of fiduciary duty and bad faith claims.

¶23  On February 4, 2011, the Stevensons filed a motion in limine which asked the court to exclude any evidence of the monetary terms of the settlement agreements between the Kimbles and the other defendants.

¶24  On February 21, 2011, First American filed a motion in limine asking the court to exclude evidence that the Kimbles' title was unmarketable as a result of the access problems. First American argued that, while the access issues might have impaired the value of the property, they did not constitute a defect in the title.

¶25 On March 1, 2011, the circuit court granted the Stevensons' motion in limine to exclude evidence of the terms of the settlement between the Kimbles and the other defendants.

Additionally, the circuit court denied First American's motion in limine to exclude evidence of unmarketability. In denying First American's motion, the court determined that the issue of marketability was a legal question to be determined by the court prior to trial. The court concluded that title to the Kimble Lot was rendered unmarketable by the access dispute. As a result, the court concluded that coverage was triggered under the title insurance policy. The court determined that it was for the jury to decide whether First American's decision not to defend the Kimbles under the policy constituted breach of contract and breach of fiduciary duty and bad faith.

¶26 On March 2, 2011, the jury trial began. At trial, the Stevensons presented evidence that First American was obligated to defend the Kimbles' title and failed to do so. The Stevensons further presented evidence that First American knew the North Easement was defective and concealed that information from the Kimbles. First American presented evidence that it had a good faith belief that the North Easement provided access, and that as a result, its failure to disclose the defect to the Kimbles was merely a mistake.[9]

¶27 On March 3, 2011, the jury returned a verdict in favor of the Stevensons. The jury found that First American breached

---

[9] As we have granted review only on the legal issue of whether the punitive damages award in this case was excessive, this opinion does not provide a detailed description of the arguments presented at trial. The evidence in the record is assumed to be sufficient to support the jury's findings in all respects except the size of the punitive damages award.

its contract and exercised bad faith in refusing to defend the Kimbles' title. The jury awarded the Stevensons $50,000 in compensatory damages for the breach of contract, and $1,000,000 in punitive damages to punish First American's bad faith.

¶28 On March 24, 2011, First American filed three motions after the verdict with the circuit court.[10] Initially, First American asked the court, pursuant to Wis. Stat. § 805.14(5)(c), to reduce the compensatory damages award. Next, First American asked the court to change the jury's answer to the bad faith question to "no" and delete the jury's punitive damages award. First American asserted that there was insufficient evidence supporting the findings. Finally, First American asked the court, in the alternative, to set aside the punitive damages award, which First American argued was excessive, and order a new trial on damages.

¶29 The Stevensons opposed First American's post-verdict motions. The Stevensons argued that the jury's award was appropriate, and that First American's conduct justified punitive damages. Further, the Stevensons argued that the jury's punitive damages award was not excessive.

¶30 On June 14, 2011, the circuit court granted First American's motion regarding the compensatory damages award, reducing it to $29,738.49. The court denied First American's

---

[10] The Stevensons argue that First American waived its right to appeal the punitive damages award by filing its post-verdict motions late. See Wis. Stat. § 805.16(1). We address this argument in part IV(A) of this opinion.

10

other motions, however, allowing the bad faith finding and the punitive damages award to stand.  The court then entered judgment against First American in the amount of $1,029,738.49.

¶31  On June 29, 2011, First American filed its notice of appeal.  On July 11, 2011, First American filed a motion with the circuit court requesting the court stay the effect of the judgment pending appeal.  On August 3, 2011, the circuit court granted First American's motion.

¶32  Before the court of appeals, First American made four arguments.  First, it argued that the Kimbles were not permitted to assign their rights under the title insurance policy to the Stevensons.  Second, First American argued that the circuit court improperly determined that coverage under the policy was invoked prior to trial.  Third, First American argued that there was insufficient evidence to support the jury's finding of bad faith.  Finally, First American argued that the punitive damages award was excessive.[11]

¶33  The Stevensons argued that the Kimbles' assignment of their rights under the insurance policy was valid, and that the circuit court properly found coverage under the title policy as a matter of law.  The Stevensons also contended that First

---

[11] First American also argued that the compensatory damages award should be further reduced.  Because this argument was not raised in First American's post-verdict motion, however, the court of appeals declined to address the issue. Kimble v. Land Concepts, Inc., No. 2011AP1514, unpublished slip op., ¶37 (Wis. Ct. App. Oct. 11, 2012) (citing Segall v. Hurwitz, 114 Wis. 2d 471, 489, 339 N.W.2d 333 (Ct. App. 1983)).

American's conduct supported the jury's finding of bad faith, and that the punitive damages award was not excessive.

¶34 On October 11, 2012, the court of appeals affirmed the circuit court. Kimble, No. 2011AP1514, slip op., ¶1. First, the court of appeals concluded that the Kimbles were permitted to assign their rights under the title policy to the Stevensons, and that they had not violated the terms of the policy in agreeing to a partial settlement. Id., ¶¶16-17. Second, the court of appeals affirmed the circuit court's determination that, as a matter of law, there was coverage under the title policy. Id., ¶¶24-28. Third, the court appeals affirmed the circuit court's determination that the jury's finding of bad faith was supported by sufficient evidence. Id., ¶¶33-35. Finally, the court of appeals summarily affirmed the jury's punitive damages award, finding First American's argument regarding excessiveness of the award to be "insufficiently developed." Id., ¶41.[12]

---

[12] Given that the availability of "'meaningful and adequate review by the trial court' and subsequent appellate review" of punitive damages awards is necessary to ensure that such awards are not imposed in an arbitrary manner, see Honda Motor Co., Ltd. v. Oberg, 512 U.S. 415, 420 (1994), the court of appeals' lack of analysis is remarkable. We take this opportunity to remind courts, both trial and appellate, of their obligation to ensure that punitive damages awards comply with due process.

12

¶35 On December 28, 2012, First American petitioned this court for review, which we granted on July 18, 2013.[13]

¶36 On September 3, 2013, the Stevensons filed a motion for summary disposition in this court, arguing that by filing its post-verdict motion late, First American had waived its right to appellate review. See Wis. Stat. §§ 805.14(5) and 805.15(1). We held the motion in abeyance.[14]

### III. STANDARD OF REVIEW

¶37 "[T]he constitutional issue of punitive damages merits de novo review." Trinity Evangelical Lutheran Church & Sch.-Freistadt v. Tower Ins. Co., 2003 WI 46, ¶47, 261 Wis. 2d 333, 661 N.W.2d 789 (citing Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 431 (2001)). "[I]n determining whether a jury's award [is] excessive, . . . the reviewing court properly review[s] the entire record 'ab inito' . . . ." Id., ¶48 (citing Mgmt. Computer Servs. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 192 n.32, 557 N.W.2d 67 (1996)).

---

[13] Because we granted review solely on the issue of whether the punitive damages award was excessive, this opinion assumes, without deciding, that the assignment was valid, that there was coverage under the insurance policy, and that the jury's finding of bad faith was supported by the evidence.

[14] In response to the Stevensons' motion for summary disposition, First American filed a motion to supplement the record, purporting to show that its post-verdict motion was filed timely, and a motion to strike the Stevensons' reply brief on the motion for summary disposition. The motion for summary disposition, as well as these additional motions are rendered moot by our decision and thus are not addressed.

¶38 We recognize that our prior case law, particularly Jacque v. Steenberg Homes, Inc., 209 Wis. 2d 605, 563 N.W.2d 154 (1997), has created confusion with respect to the standard of review in punitive damages cases. Jacque, however, predates both Cooper, wherein the United States Supreme Court clarified that de novo is the appropriate standard of review, and Trinity, wherein this court explicitly adopted that standard. While judges "serve as gatekeepers before sending a question on punitive damages to the jury," Strenke v. Hogner, 2005 WI 25, ¶40, 279 Wis. 2d 52, 694 N.W.2d 296,[15] once the issue of punitive damages is properly before the jury, its decision to award punitive damages is accorded deference. The size of the award, however, is subject to de novo review to ensure it accords with the constitutional limits of due process. Trinity, 261 Wis. 2d 333, ¶¶47-49.

## IV. ANALYSIS

### A. Post-Verdict Motion

¶39 As an initial matter we address the argument, raised by the Stevensons in their motion for summary disposition, that First American lost its right to appeal the punitive damages award when it failed to timely file its post-verdict motion under Wis. Stat. § 805.16(1).

---

[15] Strenke v. Hogner interpreted Wis. Stat. § 895.85(3) (2001-02), the predecessor to the current punitive damages statute. 2005 WI 25, ¶2, 279 Wis. 2d 52, 694 N.W.2d 296; see also Wis. Stat. § 895.043(3).

¶40 Wisconsin Stat. § 805.16(1) provides that "[m]otions after verdict shall be filed and served within 20 days after the verdict is rendered, unless the court, within 20 days after the verdict is rendered, sets a longer time by an order specifying the dates for filing motions, briefs or other documents." Further, a litigant's failure to comply with the statute causes "the circuit court [to] 'los[e] competency to exercise its jurisdiction.'" Hartford Ins. Co. v. Wales, 138 Wis. 2d 508, 513, 406 N.W.2d 426 (1987) (quoting Jos. P. Jansen v. Milwaukee Area Dist. Bd., 105 Wis. 2d 1, 10, 312 N.W.2d 813 (1981)).

¶41 The circuit court's inability to consider a post-verdict motion, however, does not deprive this court of appellate jurisdiction. Failure to comply with Wis. Stat. § 805.16 "limit[s] the issues that may be asserted as a matter of right on the appeal . . . ." Wales, 138 Wis. 2d at 510-511. "A trial court's failure to conform with sec. 805.16, Stats., however, does not strip this court of its discretionary power[]" to review the case. Brandner v. Allstate Ins. Co., 181 Wis. 2d 1058, 1071, 512 N.W.2d 753 (1994).

¶42 The merits issue in this case is of constitutional dimension and has been fully briefed and argued by both parties. We therefore exercise our discretion and address whether the punitive damages award against First American was unconstitutionally excessive.

## B. Punitive Damages Award

¶43 Punitive damages are not intended to compensate the plaintiff, but rather are awarded "to punish the wrongdoer, and

15

to deter the wrongdoer and others from similar conduct." Trinity, 261 Wis. 2d 333, ¶50. "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996).[16]

¶44 In Wisconsin, punitive damages are authorized by statute, see Wis. Stat. § 895.043, and may be awarded "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3). The judge has the duty to act as the "gatekeeper" when determining whether the issue of punitive damages is properly before the jury. Strenke, 279 Wis. 2d 52, ¶40. Once the judge has determined that the issue of punitive damages is properly before the jury, whether to actually award punitive damages "in a particular case is entirely within the discretion of the jury." Jacque, 209 Wis. 2d at 626. Both the judicial determination regarding whether punitive damages is a proper jury question and the size of the jury's punitive damages award are subject to review. The Due Process Clause of the Fourteenth Amendment

---

[16] Because punitive damages serve the State's interests, rather than serving to compensate a party, punitive damages awards do not implicate a plaintiff's right to a remedy or to a jury trial. See Wis. Const. art. I, §§ 5 and 9; compare Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund, 2005 WI 125, ¶69, 284 Wis. 2d 573, 701 N.W.2d 440 (suggesting that a statutory cap on noneconomic compensatory damages might implicate a plaintiff's right to a jury trial and to a remedy under the Wisconsin Constitution).

16

"imposes substantive limits on the size of a punitive damages award." Trinity, 261 Wis. 2d 333, ¶49 (citing Mgmt. Computer Servs., 206 Wis. 2d at 193).[17]

¶45 A punitive damages award "is excessive, and therefore violates due process, if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing." Trinity, 261 Wis. 2d 333, ¶50. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." BMW, 517 U.S. at 574; see also Trinity, 261 Wis. 2d 333, ¶51.

¶46 The United States Supreme Court has applied a three-part test to determine whether an award of punitive damages is excessive. See BMW, 517 U.S. at 574-75; State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408 (2003). This test asks the reviewing court to weigh: "(1) the degree of egregiousness or reprehensibility of the conduct; (2) the disparity between the

---

[17] We have previously stated that "the evidence must be viewed in the light most favorable to the plaintiff, and a jury's punitive damages award will not be disturbed, unless the verdict is so clearly excessive as to indicate passion and prejudice." Trinity, 261 Wis. 2d 333, ¶56; Jacque, 209 Wis. 2d at 626-27. Given that punitive damages awards mandate de novo review, see Trinity, 261 Wis. 2d 333, ¶47, this language should not be read to require deference to the amount of the jury's award. Rather, stating that an award is "so clearly excessive as to indicate passion and prejudice" is simply another way of referring to an award that violates due process.

17

harm or the potential harm suffered and the punitive damages award; and (3) the difference between the punitive damages and the possible civil or criminal penalties imposed for the conduct." Trinity, 261 Wis. 2d 333, ¶52 (citing BMW, 517 U.S. at 575).

¶47 Wisconsin case law calls on courts to apply a substantively identical test applying six factors rather than three:

1. The grievousness of the acts;

2. The degree of malicious intent;

3. Whether the award bears a reasonable relationship to the award of compensatory damages;

4. The potential damage that might have been caused by the acts;

5. The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and

6. The wealth of the wrongdoer.

Trinity, 261 Wis. 2d 333, ¶53; Mgmt. Computer Servs., 206 Wis. 2d at 194. Wisconsin courts are called upon to analyze only "those factors which are most relevant to the case, in order to determine whether a punitive damages award is excessive."[18] Id.

---

[18] While Wisconsin courts are free to apply these six factors flexibly, based upon their relevancy to a given case, they should be analyzed in conjunction with the three constitutional "guideposts" described by the Supreme Court in BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996). The factors are not intended to supplant the test mandated by the Constitution.

## 1. Reprehensibility

¶48 "'[T]he most important indicium of the reasonableness of a punitive damage[s] award is the degree of reprehensibility of the defendant's conduct.'" Trinity, 261 Wis. 2d 333, ¶57 (quoting Jacque, 209 Wis. 2d at 628). "This principle reflects the accepted view that some wrongs are more blameworthy than others." BMW, 517 U.S. at 575.

¶49 In Campbell, the Supreme Court explained the standard courts should apply in determining the reprehensibility of a defendant's conduct:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

538 U.S. at 419 (citation omitted); see also BMW, 517 U.S. at 576-77.

¶50 Turning to the case at issue, we must acknowledge that First American's conduct in the case at issue is reprehensible. First American knew that the North Easement did not provide access to the Kimble Lot and that there was no reasonable alternative access point, and yet refused to honor its obligation to assist the Kimbles in defending their title. First American further withheld the information it had in its

19

possession from the Kimbles, causing them to waste valuable time and resources. These circumstances support an award of punitive damages.[19] The question, however, is whether the degree of reprehensibility supports the punitive damages actually awarded.

¶51 In that regard, it is noteworthy that none of the reprehensibility factors identified by the Supreme Court in Campbell are present in this case. The damage suffered by the Kimbles was indisputably economic, not physical. First American's bad faith did not endanger the health or safety of any person. There is no indication in the record that the Kimbles were financially vulnerable.[20] The conduct complained of was an isolated incident. And while First American's conduct indisputably involved deception, there is no indication of intentional malice on the part of the company or its employees. The punitive damages award against First American is therefore suspect. Campbell, 538 U.S. at 419.

¶52 Further, the degree of reprehensibility in this case falls short of that found in prior Wisconsin cases supporting substantial punitive damages awards.

---

[19] The failure of an insurer to diligently investigate before denying a claim and concealing material information from an insured clearly meet this standard. See, e.g., Trinity, 261 Wis. 2d 333, ¶62.

[20] While Judith Kimble testified at trial that a dire financial situation faced by her elderly parents caused the Kimbles to reduce their asking price and be "more aggressive" in selling their home, the record does not contain any indication that the Kimbles themselves were in any financial trouble.

¶53 For example, in Trinity, the insurance company defendant denied a claim based on an omission in coverage, despite knowing that the omission in the policy was the result of its own error. 261 Wis. 2d 333, ¶¶7-8. This court held that the insurance carrier not only "engaged in prohibited conduct while knowing or recklessly disregarding the lack of a reasonable basis for denying the claim," but further was a recidivist, having previously been the subject of a lawsuit involving precisely the same kind of conduct. Id., ¶¶57-59. These facts allowed the defendant to be subjected to a more severe punitive damages award without offending due process: $3,500,000 in a case where only $490,000 in harm or potential harm had been established.[21] Id.

¶54 Here, there is no indication from the record that First American engaged in repeated conduct. Neither does the record support any finding of malicious intent. First American's conduct, while "sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award." BMW, 517 U.S. at 580.

2. Disparity

---

[21] "'[O]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.'" Trinity, 261 Wis. 2d 333, ¶58 (quoting Campbell, 538 U.S. at 423).

21

¶55 "When compensatory damages are awarded, the reviewing court is to consider whether the [punitive damages] award bears a reasonable relationship to the award of compensatory damages." Trinity, 261 Wis. 2d 333, ¶63. "Wisconsin law expressly rejects the use of a fixed multiplier, either a fixed ratio of compensatory to punitive damages or of civil or criminal penalties to punitive damages, to calculate the amount of reasonable punitive damages." Id. (citations omitted). "However, we have held that in the appropriate case, a comparison of the compensatory damages and the punitive damages award is important." Id. (citing Jacque, 209 Wis. 2d at 629).

¶56 In the case at issue, the compensatory damages ultimately awarded were $29,738.49. Using the compensatory damages award as a baseline thus represents a ratio of approximately 33:1. Such a ratio is transparently problematic under the United States Constitution.

¶57 The Supreme Court, however, has declared that reviewing courts can consider not only the compensatory damages award, but also "'the harm likely to result from the defendant's conduct.'" BMW, 517 U.S. at 581 (quoting TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 460 (1993)). Similarly, where it is relevant and appropriate, our prior case law supports consideration of "potential damage" that might have been caused by a defendant's acts. Trinity, 261 Wis. 2d 333, ¶53.

¶58 The Stevensons argue that the appropriate figure to use in assessing the disparity, in light of the sale the Kimbles

22

lost during the dispute, is the full $1,300,000 sale price of the Kimbles' home. We disagree. The Stevensons can point to no indication in the record that the full value of the Kimbles' property was ever in danger.[22] Case law does not support this type of speculative "potential damage," particularly where it is unsupported by the record.

¶59 For example, in TXO, the petitioner fraudulently attempted to undermine the title to a tract of land in order to avoid paying royalties for oil and gas extraction. 509 U.S. at 448-50. The respondent received a judgment for common law slander of title in its favor, including $19,000 in compensatory damages and $10,000,000 in punitive damages. Id. at 453. Petitioner appealed, arguing that the 526:1 ratio of compensatory to punitive damages rendered the award unconstitutionally excessive. Id. A plurality of the Supreme Court held that, in addition to the compensatory damages award, it was appropriate to consider the "between $5 million and $8.3 million" in lost royalties that the respondent would have suffered had petitioner's plan succeeded. Id. at 460-61.

¶60 Similarly, in Trinity, this court accepted that the appropriate figure for comparison was not the $17,000 compensatory damages award, but rather was the $490,000 in potential damages at risk in the underlying negligence suit.

---

[22] On December 26, 2013, the Stevensons filed a motion to supplement the record by judicial notice, asking this court to take into account the eventual sale price of the Kimbles' home. We deny that motion. The supplemental information was not part of the record before the trial court.

23

¶61 Notably, the "potential harm" in both of these cases is grounded in record and is not merely speculative. Had the plaintiff in Trinity lost its case, $490,000 was the amount it would have had to pay. Had the petitioner's scheme in TXO succeeded, it was undisputed that the respondent would have been deprived of millions of dollars in royalties. These analyses were firmly rooted in fact, and the amounts in question were derived from the record.

¶62 Here, the Stevensons invite this court to depart from the facts of the record and speculate that, had the Kimbles failed to discover First American's bad faith, they would have been completely unable to sell their property, rendering it valueless. We decline this invitation. Many factors enter into a completed sale of real estate, and to attribute full responsibility for the lost sale to First American is highly speculative. There is no clear indication in the record of what impact the access dispute had on the value of the Kimbles' property.

¶63 We share Justice Kennedy's concern that, without a meaningful standard, a court can end up "relying upon nothing more than its own subjective reaction to a particular punitive damages award in deciding whether the award violates the Constitution." TXO, 509 U.S. at 466-67 (Kennedy, J., concurring).

¶64 Fortunately, there is no need to speculate about potential harm, or to rely on subjective reactions, in order to appropriately assess the disparity in this case. The record

24

reveals that the Kimbles spent $40,000 to purchase the access to their property that their title policy was supposed to insure.[23] Given that the compensatory damages award merely accounted for legal expenses, it is appropriate to add the compensatory damages together with the cost of purchasing the access for purposes of assessing the disparity of the punitive damages award.  This $69,738.49 figure, however, still represents a problematic ratio of approximately 14:1.

¶65 "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  Campbell, 538 U.S. at 425.  Even a punitive damages award of just four times compensatory damages can come "'close to the line'" of violating due process.  BMW, 517 U.S. at 581 (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 (1991)).[24]

¶66 In the case at issue, there are no special circumstances calling for a high ratio punitive damages award.  This becomes especially apparent when the conduct here is

---

[23] Although this evidence was not before the jury at trial, it was before the circuit court and was made a part of the record on appeal.  We may, therefore, properly consider it in "review[ing] the entire record 'ab inito' . . . ."  Trinity, 261 Wis. 2d 333, ¶48.

[24] Additionally, the Wisconsin Legislature recently enacted a law limiting punitive damages awards.  See 2011 Wis. Act 2 § 23m.  The new statute caps punitive damage awards at a 2:1 ratio of compensatory damages or $200,000, whichever is greater.  Wis. Stat. § 895.043(6) (2011-12).  While the statute is not applicable to this case, it is nonetheless appropriate to consider the legislature's judgment of a reasonable disparity of punitive to compensatory damages.

compared to other cases where courts have upheld high ratio awards.  See, e.g., Trinity, 261 Wis. 2d 333; J.K. v. Peters, 2011 WI App 149, 337 Wis. 2d 504, 808 N.W.2d 141 (upholding a high ratio punitive damages award against a social worker who sexually assaulted his minor client); Strenke v. Hogner, 2005 WI App 194, 287 Wis. 2d 135, 704 N.W.2d 309 (upholding a high ratio punitive damages award against a drunk driver who caused substantial injuries to another motorist).[25]  These prior cases involve the kind of especially egregious conduct identified by the Supreme Court in Campbell, including "physical as opposed to economic" harm, and "indifference to or a reckless disregard of the health or safety of others."  538 U.S. at 419.  As we have discussed, the case at issue does not involve such conduct.

¶67 In sum, the award in this case does not bear a "reasonable relationship" to either the compensatory damages award or the potential harm faced by the Kimbles.  We conclude, therefore, that the award does not comport with due process.

### 3. Civil or Criminal Penalties

¶68 Finally, "we engage in a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct."  Trinity, 261 Wis. 2d 333, ¶66 (citing Jacque, 209 Wis. 2d at 630).  In this case, as in Trinity, First American could be subject to a criminal penalty,

---

[25] The court of appeals upheld the damages award in Strenke on remand from this court.  This court was equally divided on the question of whether the award of punitive damages was excessive.  See Strenke, 279 Wis. 2d 52, ¶58.

26

including a fine of up to $10,000, for the violation of "any insurance statute or rule of this state." Wis. Stat. § 601.64(4). The Stevensons argue that First American violated Wis. Admin. Code § Ins. 6.11(3)(a), which prohibits unfair settlement practices.

¶69 In this case we conclude, as we did in Trinity, that "a criminal penalty has 'less utility' when used to determine the dollar amount of the punitive damages award." 261 Wis. 2d 333, ¶68 (citing Campbell, 538 U.S. at 428). We nonetheless note that "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action." Id., ¶66 (quoting Campbell, 538 U.S. at 428).

### 4. Application

¶70 Applying the relevant factors to the case at issue, we conclude that the punitive damages award against First American is excessive. First, First American's conduct "is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award." BMW, 517 U.S. at 580. Second, there is no especially egregious conduct supporting a high ratio punitive damages award. Absent such egregious conduct, even the 7:1 ratio imposed in Trinity would be unconstitutionally excessive. Finally, the existence of an additional civil or criminal penalty has "limited utility"

in determining the reasonableness of the punitive damages award.[26] See Trinity, 261 Wis. 2d 333, ¶68.

¶71 We conclude, in consideration of the case law, that the appropriate amount of punitive damages in this case is $210,000. Comparing the amount of this award to the $69,738.49 amount of compensatory and potential damages results in a ratio of approximately 3:1, below the ratio we upheld in Trinity, and just below the constitutional "line" mentioned by the Supreme Court in BMW, 517 U.S. at 581, and Haslip, 499 U.S. at 23. Because "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," Campbell, 538 U.S. at 425, we conclude that this amount effectively punishes First American's misconduct, while acknowledging that its conduct did not rise to level of egregiousness found in prior punitive damages cases.

V.   CONCLUSION

¶72 We conclude that the punitive damages award in this case was excessive and deprived First American of its right to

---

[26] We note here, as we did in Trinity that "[t]he factors discussed are the ones most relevant in this case . . . [and] there are other factors that may be relevant given the nature of the case at hand." 261 Wis. 2d 333, ¶69. In particular, we note that while the "[d]efendant's wealth is oftentimes a significant factor," id., it is not significant in this case. The record indicates First American would likely be able to pay the amount specified by the jury. Standing alone, however, the "wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 427 (2003) (citing BMW, 517 U.S. at 585).

due process.   We therefore reverse the court of appeals' decision and remand this case to the circuit court for entry of judgment against First American in the amount of $239,738.49.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court.

¶73  DAVID T. PROSSER, J., did not participate.

¶74 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting)*. The majority opinion reaches a shocking result: It makes First American's wrongdoing an efficient way of doing business. For all its reprehensible conduct, First American in fact pays less by acting in bad faith and wrongfully refusing to pay the Kimbles' claim than it would have paid had it honored the claim in good faith after discovering its error. Under the majority opinion, the combined punitive and compensatory damages amount to $239,738.49——a sum smaller than the title insurance policy limit of $370,000. This result directly contravenes the entire purpose of punitive damages——making wrongdoers pay and deterring future wrongful conduct.

¶75 <u>Trinity Evangelical Lutheran Church & School-Freistadt v. Tower Insurance Co.</u>, 2003 WI 46, 261 Wis. 2d 333, 661 N.W.2d 789, is the leading case for determining whether punitive damages are unconstitutionally excessive as a violation of due process. The majority opinion dutifully recites the <u>Trinity</u> factors.[1] Yet the majority opinion jettisons <u>Trinity</u>, turning the test on its head in favor of the reasoning set forth in <u>Trinity</u>'s dissent.

¶76 The majority opinion achieves a result in which the wrongdoer was enriched by its wrongdoing. This result, in my opinion, cannot stand.

¶77 The test in <u>Trinity</u> applies six factors to assess whether a punitive damages amount is justified:

1. The grievousness of the acts;

---

[1] Majority op., ¶48.

1

2. The degree of malicious intent;

3. Whether the award bears a reasonable relationship to the award of compensatory damages;

4. The potential damage that might have been caused by the acts;

5. The ratio of the award to civil or criminal penalties that could be imposed for comparable conduct; and

6. The wealth of the wrongdoer.

Majority op., ¶48; Trinity, 261 Wis. 2d 333, ¶53.

¶78 It is perverse not to apply the Trinity test to the instant case. The instant case is on all fours with Trinity. In both cases an insurance company refused to pay the insured's claim (breach of contract); the court found that the insurance company breached the insurance contract; the insurance company was found to have acted in bad faith; and the fact-finder found that the misconduct justified a punitive damage award.[2]

---

[2] Here are the facts of Trinity: An employee of Trinity Church, the insured, was in a motor vehicle accident, and Trinity Church was liable for damages of $490,000.

An agent of Tower Insurance erred by not providing Trinity Church the coverage that Trinity Church requested.

Tower Insurance refused to reform the policy to cover Trinity Church (as the law required it to do) and to pay $490,000 on behalf of Trinity Church. Trinity Church sued Tower Insurance for breach of contract, bad faith, and punitive damages.

Tower Insurance paid $490,000 on Trinity Church's behalf.

2

¶79 In <u>Trinity</u>, the court held that due process was satisfied by a punitive damages amount of $3,500,000 based on a potential harm of $490,000, a 7:1 ratio.

¶80 Because the majority opinion fails to apply <u>Trinity</u> properly, I dissent.

I

¶81 The first factor of the <u>Trinity</u> test is the grievousness of the acts. The insurance company's misconduct was substantially the same in <u>Trinity</u> and in the present case:

- In each case, an insurance company was sued by its insured (or someone standing in the insured's shoes);

- In each case, the insurance company had failed to pay the claim of its own insured;

- In each case, the insurance company was given repeated opportunities to pay the claim and refused to do so,

---

The <u>Trinity</u> court used the $490,000 figure as harm to Trinity Church to calculate the punitive damages. Had Tower Insurance's misconduct not been discovered, Trinity Church would have had to pay the full $490,000 from its own funds; Tower Insurance would have received a net gain of $490,000. In calculating the harm to Trinity Church, the <u>Trinity</u> court did not take into account that Tower Insurance's agent might ultimately be responsible for paying the $490,000.

Here are the facts in the instant case: First American erred in not providing the Kimbles with their policy limits of $370,000 when First American discovered that the Kimbles' title was not marketable. Had First American's misconduct not been discovered, the Kimbles could not have sold their property, leaving them with a loss of both the $1.3 million sale price of the property and the $370,000 policy limits of the First American title insurance policy. First American would have received a net gain of $370,000.

3

despite knowing the facts justifying payment of the claim;

- In each case, the insurance company was found to have acted in bad faith; and

- In each case, a jury awarded over $1 million in punitive damages.

¶82 The Trinity court held that the insurance company's misconduct constituted a "continuing, egregious, and flagrant pattern of disregard toward [the insurance company's] duty owed to its insured," which justified the punitive damages in that case.[3]

¶83 The majority opinion in the present case characterizes First American's conduct as not as reprehensible as that of the insurance company in Trinity. Majority op., ¶¶53-55, 71.

¶84 The majority opinion's conclusion does not square with the facts of the two cases.

¶85 First, as in Trinity, the legislature has made the insurance company's misconduct a crime, demonstrating the public policy of this state regarding the misconduct's reprehensibility. See majority op., ¶69; accord Trinity, 261 Wis. 2d 333, ¶57.

¶86 Second, as in Trinity, First American's misconduct was repeated; First American was a recidivist.[4] In Trinity, the

---

[3] Trinity, 261 Wis. 2d 333, ¶62.

[4] Majority op., ¶53 n.20 (quoting Trinity, 261 Wis. 2d 333, ¶58: "'[O]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.'") (internal citation omitted).

4

court noted that the insurance company's agent "made a series of decisions that illustrate bad faith" and chastised the insurance company's repeated misconduct and failure to investigate.[5]

¶87 The majority opinion erroneously states that First American's misconduct was "an isolated incident," and that "there is no indication from the record that First American engaged in repeated conduct." Majority op., ¶51. On the contrary, First American in the instant case demonstrates a pattern of repeated misconduct. After discovering its initial error, First American had many opportunities to remedy its misconduct and instead continued to act improperly:

- When the Kimbles first inquired about their road access, First American asserted that an easement gave them access, when it in fact knew that the easement granted to the Kimbles was invalid.[6]

- When the Kimbles inquired whether they could assert a claim to the easement, First American assured them that they had road access.[7]

- At trial, First American's agent admitted that it discovered the deed that rendered the Kimbles' easement invalid, and chose never to inform the Kimbles about the deed.[8]

---

[5] _Trinity_, 261 Wis. 2d 333, ¶60.

[6] Majority op., ¶9.

[7] Majority op., ¶10.

[8] The trial yielded the following testimony:

- At trial, First American's agent admitted that it deliberately failed to investigate the alleged title defect.[9]
- Each time the Kimbles inquired as to their access, First American insisted that the Kimbles could access the road, variously stating that the Kimbles could go across a 25-foot strip to which they had no access,[10]

---

[KIMBLES' COUNSEL]: Now, at your——at your deposition, I asked you whether you made any mention of the Cofrin deed [which rendered the easement invalid] to [the Kimbles' agent] in March of 2008. Do you recall that?

[FIRST AMERICAN'S AGENT]: Yes.

[KIMBLES' COUNSEL]: And we talked about your letters that you sent back and forth with him, correct?

[FIRST AMERICAN'S AGENT]: Yes.

[KIMBLES' COUNSEL]: And you acknowledge that it's true that you never told [the Kimbles' agent] about the Cofrin deed at any time in any of your conversations or in any of your letters?

[FIRST AMERICAN'S AGENT]: That is correct.

[9] At trial, an investigator employed by First American testified that she asked First American's agent whether she should investigate further. The investigator suggested problems with the validity of the deed, and asked, "What does all of this mean for us?" and "Do you want me to dig for more documentation?" The investigator testified that she never received a response.

[10] The access to the south depended on an easement across a 25-foot strip of property. First American testified at trial that "Land Concepts [which does not want to give access] owns the fee simple interest to the 25-foot strip."

through a wetland that was barred from road construction,[11] and confusingly, "by water."[12]

¶88 The majority opinion maintains that the repeated misconduct here is less reprehensible than the repeated

---

[11] See court of appeals brief of defendant-appellant at 21. The access to the south also needed to cross lands marked as wetlands. The trial record reflects the following exchange:

[KIMBLES' COUNSEL]: And did you take the position that the [Kimbles] had a right of access to their property to the south?

[FIRST AMERICAN'S AGENT]: Yes.

[KIMBLES' COUNSEL]: Through an area of forest and wetlands, correct?

[FIRST AMERICAN'S AGENT]: Yes.

Yet, government regulations prohibited development on the forest and wetlands, as the defendant's agent testified:

[KIMBLES' COUNSEL]: And you know from reading [the government official's] deposition that the area that you've described is defined as wetlands according to Door County Planning, right?

[FIRST AMERICAN'S AGENT]: That's correct.

[KIMBLES' COUNSEL]: And that, in fact, Door County Planning has indicated that that area could not be developed into any road or opened or cleared, true?

[FIRST AMERICAN'S AGENT]: That is correct.

[12] The trial record reflects the following exchange:

[KIMBLES' COUNSEL]: Well, you recall testifying at that court trial regarding whether the company was, in fact, at that time on Tuesday going to assert that the Kimbles enjoyed a right of access by water. Do you recall that testimony?

[FIRST AMERICAN'S AGENT]: It came up. I recall it coming up.

7

misconduct in Trinity because the insurance company in Trinity had committed similar misconduct in another case 30 years previously. Majority op., ¶53.

¶89 Yet the key factor for the reprehensibility of the insurance company's misconduct in Trinity was not that a 30-year-old prior court case existed or that the insurance company knew about it, but rather that the insurance company's "decisions, acts, and omissions . . . illustrate a continuing, egregious, and flagrant pattern of disregard toward [the insurance company's] duty owed to its insured . . . ." Trinity, 261 Wis. 2d 333, ¶62.

¶90 The record in the present case demonstrates that First American exhibited a similar continuing, egregious, and flagrant pattern of misconduct.

II

¶91 The second factor is whether there was "intentional malice."

¶92 The majority opinion in the present case states that "there is no indication of intentional malice on the part of the First American or its employees." Majority op., ¶52. Similarly, the Trinity court concluded that there was no indication of intentional malice in that case either. Indeed Trinity does not require malice in order for punitive damages to be awarded. Rather, Trinity justified the amount of the punitive damages award on the insurance company's "intentional disregard of its duty to investigate diligently to ascertain and

evaluate the facts and circumstances . . . ." <u>Trinity</u>, 261 Wis. 2d 333, ¶59.

¶93 The jury in the instant case found sufficient grounds to justify a finding that punitive damages should be awarded, based on the evidence presented and the jury instructions. The jury instructions stated that the jury should award punitive damages if it found that "the defendant acted maliciously toward the plaintiff or in an intentional disregard for the rights of the plaintiff."[13] With a $1 million jury award of punitive

---

[13] Wis JI——Civil 1707.1, which was given to the jury, reads in relevant part:

Punitive damages may be awarded, in addition to compensatory damages, if you find that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.

A person's acts are malicious when they are the result of hatred, ill will, desire for revenge, or inflicted under circumstances where insult or injury is intended.

A person acts in an intentional disregard of the rights of the plaintiff if the person acts with the purpose to disregard the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded. Before you can find an intentional disregard of the rights of the plaintiff, you must be satisfied that the defendant's act or course of conduct was:

(1) deliberate;

(2) an actual disregard of the plaintiff's right to safety, health, or life, a property right, or some other right; and

(3) sufficiently aggravated to warrant punishment by punitive damages.

. . . .

damages, the jury found the "high degree of culpability" that could justify a punitive damages award.[14] Credible evidence supports the jury's finding of either malicious intent or intentional disregard of the rights of the insured. The majority opinion does not state that the evidence was insufficient for the jury to make such a finding. The jury finding is sufficient to satisfy Trinity.

III

¶94 The Trinity test's third factor (ratio of compensatory damages to punitive damages) and fourth factor (potential damage to the plaintiff) are linked.

¶95 Trinity examined the ratio between potential harm and punitive damages to determine the appropriateness of the award. Trinity, 261 Wis. 2d 333, ¶65. "Wisconsin law expressly rejects the use of a fixed multiplier . . . ." Trinity, 261 Wis. 2d 333, ¶63.

---

Factors you should consider in answering Question No. 6 [awarding the amount of punitive damages] include:

1. the grievousness of the defendant's acts,

2. the degree of malice involved,

3. the potential damage which might have been done by such acts as well as the actual damage, and

4. the defendant's ability to pay. You may consider the defendant's wealth in determining what sum of punitive damages will be enough to punish the defendant and deter the defendant and others from the same conduct in the future.

See also Wis. Stat. § 895.043(3).

[14] Majority op., ¶54.

¶96 Despite the lack of a fixed multiplier, Trinity provides a benchmark for the court. If a 7:1 ratio of punitive damages to potential harm ($3,500,000 punitive; $450,000 potential harm) and a 200:1 ratio of punitive damages to actual damages ($3,500,000 punitive; $17,570 actual damages) were permissible in Trinity, the instant case, so similar in facts, also supports an identical or similar ratio.

¶97 The amount of potential harm is calculated by analyzing "'the harm likely to result from the defendant's conduct as well as the harm that actually has occurred.'" TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460, (1993) (quoted source omitted).

¶98 In the instant case, the Kimbles were harmed. They had an offer to buy their property for $1.3 million. They wanted to sell. They chose to reduce the asking price to secure the sale because they needed to care for aging parents who had lost their home. The Kimbles introduced evidence that the sale failed because of the lack of road access, a defect in marketable title that had been insured by First American.

¶99 The Kimbles had purchased title insurance to protect them from damages arising out of the unmarketability of their title. The policy limit was $370,000. The value of the property with marketable title was about three times the policy limit.

¶100 The majority opinion erroneously asserts that a consideration of the loss of value of Kimbles' home would force the court "to depart from the facts of the record and speculate

11

that, had the Kimbles failed to discover First American's bad faith, they would have been completely unable to sell their property, rendering it valueless." Majority op., ¶62.

¶101 Yet this potential harm is borne by the record. The lack of access constituted "unmarketability of the title."[15] The policy itself defines "unmarketability of the title" as "an alleged or apparent matter affecting the title to the land . . . which would entitle a purchaser of the estate [or the Kimbles] to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title." As First American's agent stated in a deposition entered into evidence at trial, the risk of wrongly denying the claim was that the Kimbles "would have had a real big claim on the policy . . . ."

¶102 In Trinity, the facts were similar. The insured in Trinity would have incurred a potential loss of up to $490,000 (damages in the auto accident case), had the insurance company successfully continued to deny Trinity Church's claim. The majority opinion in Trinity used the $490,000 figure for evaluating the punitive damages award.

¶103 In the instant case, the Kimbles would have potentially incurred a loss of up to $1.3 million, the sale price of the property if they had marketable title, and would

---

[15] "[E]ven if the policy does not expressly cover lack of a right of access, if it insures against unmarketability of the title, the title insurer will be liable if no legal access to the land exists. The majority rule is that lack of access makes title unmarketable." 1 Joyce D. Palomar, Title Insurance Law § 5:8 (West 2013-2014).

not have recovered First American's title policy limits ($370,000), had First American successfully denied the Kimbles' claim.

¶104 The majority opinion refuses to use the $1.3 million sale price or $370,000 policy limit figures to calculate punitive damages. Instead the majority opinion adopts the reasoning of the dissent in Trinity.

¶105 Justice Sykes' dissent in Trinity argues that the insured "was never at risk for the auto accident damages, because either the agent (that is, his error and omissions carrier) or [the insurance company] was responsible for the mistake in the insurance application. The actual compensatory damages in the bad faith claim consisted of the attorneys' fees Trinity [Church] incurred in the coverage dispute, not the personal injury damages in the underlying lawsuit, which Trinity [Church] would not and did not have to pay." Trinity, 261 Wis. 2d 333, ¶106.

¶106 The majority opinion in the present case follows Justice Sykes' approach by severely limiting what is actual and potential harm, rather than employing the correct Trinity majority opinion approach of using "the harm that is likely to result."[16]

¶107 When title is not marketable, the significantly reduced value of the property and the inability of an insured to collect from the title insurance company are exactly "the

---

[16] TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460 (1993).

13

harm[s] that [are] likely to have occurred" when a title insurance company fails to pay a worthy claim. Thus, the proper potential harm is at least the policy limits of $370,000, if not the lost sale of the house ($1.3 million), or both, rather than the mere $40,000 used by the majority opinion.

¶108 As to the proper ratio here, the majority opinion relies upon its mistaken "reprehensibility of conduct" analysis to justify a lower ratio than the Trinity 7:1 ratio of punitive damages to potential harm and the 200:1 ratio of punitive damages to actual damages that this court held constitutional. Trinity, 261 Wis. 2d 333, ¶¶65, 68, 105; majority op., ¶66.

¶109 Even though the misconduct of First American here is essentially analogous to the misconduct in Trinity and may even be more egregious, the majority opinion applies only one guiding principle: High numbers for compensatory and punitive damages are bad; low numbers are good.

¶110 The majority settles on its 3:1 ratio for no ostensible reason other than that it is lower than the 7:1 and 200:1 ratios in Trinity and the 4:1 ratio in Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 23-24 (1996). Yet in Pacific Mutual Life Insurance Co., the United States Supreme Court held that the 4:1 ratio was "close to the line," not over it.

¶111 The majority opinion also looks to a newly adopted state statute, which fixes $200,000 or a 2:1 ratio of punitive damages to compensatory damages as the limits for punitive damages awards. Majority op., ¶66 n.23. The statute is

14

irrelevant. The majority opinion deliberately defies the legislative direction that the statute does not apply to the present case. Furthermore, the constitutional due process doctrine that we must apply in the present case rejects a fixed amount for punitive damages or a fixed multiplier. "Excessive" for due process purposes is a "fluid concept" that takes "substantive content from the particular context[] in which the standard[] [is] being assessed."[17]

¶112 What was good enough for the _Trinity_ court seems to no longer be good enough for the majority opinion in the present case.

IV

¶113 The fifth _Trinity_ factor is "a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." _Trinity_, 261 Wis. 2d 333, ¶66. I agree with the majority opinion that the imposition of criminal or civil fines does not directly impact the amount of punitive damages in the instant case, for the same reasoning we used in _Trinity_. _See_ majority op., ¶69.

¶114 Nevertheless, the prohibited conduct's punishment by criminal sanctions under Wis. Stat. § 601.64(4) evinces the legislative determination of the reprehensibility of First American's misconduct.

V

---

[17] _Cooperman Indus., Inc. v. Leatherman Tool Group, Inc.,_ 532 U.S. 424, 436 (2001).

15

¶115 The sixth Trinity factor is the wealth of the wrongdoer. The United States Supreme Court has also recognized the wealth of the wrongdoer as a factor to be considered in gauging the constitutionality of a punitive damage award.[18]

¶116 The purpose behind the wealth factor is to punish wrongdoers and make the penalty for wrongdoing sufficiently high for wealthy wrongdoers that they are deterred from engaging in future misconduct.[19]

---

[18] The wealth and financial position of the defendant are examined to assess the excessiveness of the punitive damages award. See, e.g., TXO Production Corp., 509 U.S. 443, 462 (1993); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1996).

[19] The majority opinion states the purpose of punitive damages as follows:

> [Punitive damages] are awarded "to punish the wrongdoer, and to deter the wrongdoer and others from similar conduct." Trinity, 261 Wis. 2d 333, ¶50. "Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568 (1996).

Majority op., ¶43.

Justice Steinmetz articulated the reasoning behind considering the wealth of the parties in his dissent in Brown v. Maxey, 124 Wis. 2d 426, 452, 369 N.W.2d 677 (1985) (Steinmetz, J., dissenting). He stated:

> The policy justifications for punitive damages are generally considered to be: punish the wrongdoer and specifically deter him and generally deter others from engaging in similar conduct. . . . It is almost universally accepted that money talks. By tailoring the amount of punitive damages to the relative wealth of the individual, every wrongdoer is more or less equally affected by the sanction.

16

¶117 In the instant case, the record demonstrates that in 2010, First American had revenues over $2 billion and net profits of $65 million. First American easily had the ability to pay the $1 million the jury awarded as punitive damages and then some.

¶118 Yet in the instant case, the majority opinion's result, as I noted previously, creates a final combined punitive and compensatory damages amount of $239,738.49—a sum smaller than the title insurance policy limit of $370,000. The majority opinion makes First American's wrongdoing an efficient course of business. First American in fact pays less by acting in bad faith and wrongfully refusing to pay the Kimbles' claim than it would have paid had it honored the claim in good faith after discovering its error. This result directly contravenes the entire purpose of punitive damages, let alone the purpose of awarding punitive damages against a wealthy defendant.[20]

¶119 The majority opinion again strays from _Trinity_. _Trinity_ held, contrary to the majority opinion in the instant case, that evidence of the insurance company's wealth and ability to pay the full amount was "sufficient to justify the size of the punitive damages award." _Trinity_, ¶69. In _Trinity_,

---

[20] This rationale was echoed by the court in _Jacque v. Steenberg Homes_, 209 Wis. 2d 605, 631, 563 N.W.2d 154 (1997), which explained the need to eliminate the profit motive for wrongdoing:

> Punitive damages, by removing the profit from illegal activity, can help to deter such conduct. In order to effectively do this, punitive damages must be in excess of the profit created by the misconduct so that the defendant recognizes a loss.

17

the company would have had to liquidate assets to pay the award.[21] First American has no similar concern here.

¶120 The majority opinion dismisses the wealth factor in the present case in a footnote, flouting Trinity and the United States Supreme Court cases. The majority opinion states simply that "it is not significant in this case." Majority op., ¶70 n.25. Why is the wealth of First American not significant in this case? The majority opinion does not explain, other than to cryptically state that "[t]he record indicates that First American would likely be able to pay the amount specified by the jury." Id. Is the majority opinion implying that First American's ability to pay means the punitive damages were too low or that the punitive damages can never be high enough to deter First American's misconduct in the future? Is First American too big, too well-to-do to punish?

\* \* \* \*

¶121 The majority opinion has ignored and misapplied the Trinity test to substantially similar facts in the present case and reaches an outcome contrary to Trinity.

¶122 The majority opinion achieves a result in which the wrongdoer is enriched by its wrongdoing. First American ends up paying less in damages for acting improperly than it would have paid had it acted properly and paid the claim. This result, in my opinion, cannot stand.

¶123 For the foregoing reasons, I dissent.

---

[21] Trinity, 261 Wis. 2d 333, ¶69 n.8.

¶124 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.